Good morning, your honors. May it please the court, Devin Burstein, excuse me, Federal Defenders, on behalf of Mr. Torres. In Liera, Judge Pregerson, you explained that under Rule 5, a defendant must be brought before a magistrate judge, quote, as quickly as possible. Now, plainly here, that didn't happen. Instead of promptly presenting Mr. Torres to a nearby magistrate judge on the day of his arrest, the government detained this young United States citizen, somebody with no criminal history, for days in substandard conditions, with no access to a court, with no access to counsel, and with no access to bail. Now, as your honors are aware from the briefs and hopefully from the chart I provided the court, that delay was wholly unnecessary. Now, under the McNab-Mallory rule, as construed by the Supreme Court in Corley, Mr. Torres' confession, quote, is to be suppressed. Now, Corley's specimen, yes, Judge. Before you go down that line, referring to your chart, can you explain the steps that are taken? Somebody is identified, arrested. What's the process that ties the complaint, which is drafted, as I understand, by law enforcement? Correct. It's not presented to a prosecutor? Correct. That's correct? It's just the element? It literally travels at the speed of light to the magistrate judge through the facts. And so there's no intervening act by a district attorney or a U.S. attorney who has to review it? It's just the, it's drafted by law enforcement? The complaint in this case was drafted, as the government makes clear in its brief, by the arresting agent. Right. Okay. And then, so what's then the process, where does that piece of paper go? That piece of paper goes to the magistrate judge. And what does the magistrate judge do with it? Reviews it, assuming reviews it and signs a copy of it. Which means then that, and what's the legal effect of that? It's a, I assume it's a preliminary, not I assume, it is a preliminary determination of probable cause. Okay. That accords generally with what I thought. So that basically says it's okay to hold the person in custody, is that correct? Yes, but that person needs to be brought. I understand. Then the next step is presentment to the magistrate who has to, but the first, the complaint can be sent over the fax or whatever. But that's not the same thing as bringing the defendant before the magistrate. No. So what happened in this case, they say they were drafting the complaint. Correct. And then there was no magistrate because of the long weekend until Monday or Tuesday, whatever it was. Which we know is factually incorrect. Well, that's okay. I'm just, I'm not binding you to the, that's what happened. And the argument is there wasn't a magistrate available to bring him to. That's disputed, I understand. But that would be the normal process. The complaint goes, and then shortly thereafter, I think, what is it, the 48 hours, is that it? Okay. There are two windows here, and I'm trying to sort them out, not knowing, you know, having done this. Right. The problem, that, the 48-hour rule is different than the Rule 5 rule. Yes. The McNab-Mallory rule. Right. Which is the six-hour window that you have. Safe harbor. Okay. Right. But the safe harbor is 3501, is somewhat of an exception, exception to McNab-Mallory. Yeah. But the plain rule is not 48 hours. Clearly, none of the, you know, Liera would have come out differently. Okay. Valenzuela-Espinoza, it's as soon as possible. Yes. Now, it doesn't have to be, it can be, the complaint can be brought at the same time as the person. The complaint, we're talking here, getting to the facts, a very short complaint that could have been brought, faxed in with the person. Now, Mr. Torres was arrested at 930 in the morning. There is nothing whatsoever that prevented the officers from, once they interrogated him, he invoked his right to counsel, from bringing him to court in time for, the beginning of the 2 p.m. calendar is 2 p.m., not the end. There's a magistrate judge available. And now you see exactly why we have Rule 5, because what happened? The government doesn't bring him. And what does he do? He sleeps on the floor in cold conditions, which Judge Moskowitz has described in Monero, in substandard conditions, for days. He could have been, he almost certainly would have been granted bail. He's a United States citizen with no criminal history. Because they don't do that, he's kept on the floor. Then he's finally transported. And it's not a big wonder that a young kid transported starts to wonder, oh, my God, how much time am I going to do? I was just kept on the floor for a few days. This is getting pretty scary. And that's exactly why we have Rule 5. So these kinds of, this kind of conduct doesn't happen. Now, I'm not saying it's bad faith, but certainly we know exactly what would have happened if the government had followed Rule 5, if they had followed McNab-Malley, Corley, Liera, late great Judge Fletcher's opinion in Valenzuela-Espinoza. I'm familiar with the case law. It's just the on-the-ground procedure that I was confused about. Yes, Judge Fischer. Let me ask this related question. The drugs were seized at 10 a.m. Are you, after the prior arrest at around 9.30, are you saying there was adequate time for the complaint to have been lodged by mid-afternoon such that it would have been presented to the magistrate judge before 5 p.m.? Absolutely. And the failure to do that then means that your client's constitutional rights were violated.  I should say legal rights, including constitutional rights. Yes. Right. That's where the rights were violated, certainly. In Valenzuela-Espinoza, the court says, look, there was enough evidence right at the time because he came out in a cloud of marijuana smoke. Well, here he was sitting on a pillow of marijuana, essentially. There was marijuana found in the passenger seat where Mr. Torres was sitting.  Well, certainly at that point they believed they had probable cause or this arrest would have been illegal. So if they have probable cause to arrest him, if they find marijuana in his seat, just bring him to a neutral magistrate judge. That is the whole point, is because we don't want things like this happening. We don't want people kept in substandard conditions. We don't want young United States citizens denied bail, denied counsel. And in this case, it's wholly unnecessary. A magistrate court starts it to but doesn't end. They could have brought him, and certainly having been in Southern District for a long time and done numerous magistrate courts, we wait. If somebody is in the middle of being processed, the lawyers will take a brief recess and we will wait, and then the person will be arraigned as they should be under Rule 5. I see I have about two minutes left. There was only a 17-mile distance between the port of entry where the magistrate judge held court up until about 5 o'clock on that day. That is correct, Your Honor. There's only a 17-mile difference. Wide open road, too, isn't there? Especially when you're in a border patrol car with signs. Thank you, Your Honor. I'll reserve the rest of my time. All right. Good morning. May it please the Court. Mark Rahe for the United States. Your Honors, the district court ---- Can I just ask a question? Sure. A reference was made to Valenzuela-Espinosa. Correct. This case wasn't part of that local rule where if you didn't get your papers in by 1015 ---- No. No. I believe Valenzuela-Espinosa was out of the District of Arizona. I know it was, but I don't ---- Okay. Is there something like ---- Not as far as a paperwork policy, no. As far as we know, the Southern District doesn't have something like that. No. Okay. Your Honors, what I want to do here today, I think my opponent has given a false factual impression of what happened here. And the important thing to keep in mind is this Court is held in Van Poyck, and going back as far as 1970 to the Halbert case, the defense has the burden of proof on showing unnecessary or unreasonable delay. In this case, it's true that the defendant was taken into custody around 930 in the morning. But there seems to be this factual assumption that all the drugs were found by 10 a.m. In fact, that, I believe, is the quote in the opening brief. When you look at the excerpt of record, it's page 52, that they ciphered that. The drugs were not found at 10 a.m. What it says is at 10 a.m., the car was assigned for its seven-point secondary inspection. Excerpt of record 61 then points out that the car had to be x-rayed, and that's a special machine that takes time. But more importantly, this wasn't just a five-kilogram or a penny-ante border bust. This was 150 pounds of marijuana. And as it turned out, they were found in no less than 37 different packages. And they weren't all placed in one area. They were in the rear quarter panels, the driver's side panels, in the third seat, the back seat, under the seat. So I think that's an important factual point to keep in mind. Another one that the defense kind of glosses over, this was not just a one-defendant case. This defendant, Mr. Pimentel, was the passenger in a vehicle. The vehicle, he had no tie to it. It wasn't as if he were the registered owner. It was the uncle of the driver's car. And Mr. Pimentel invokes. He invokes two minutes after he's Mirandized, so he never makes any statement. And it's true, that all happens around 1242 p.m. So what are the officers faced with then? A passenger who hasn't said anything, in other words, hasn't made any admissions of guilt, who can't even be tied to the car. Now, the Valenzuela-Espinoza case that my opponent relies on so much says is one, there are three recurring categories of reasonable delay. One of them is time in which to decide whether to charge the defendant. Now, I know my opponent tried to contrast the facts, or he brought up the facts of Valenzuela-Espinoza. Those facts couldn't be more different than the ones here. In that case. There was no cloud of smoke when he came out of the car? No, there was no smoke in this case, but exactly. In Valenzuela-Espinoza, the defendant comes out of a home where they're literally burning marijuana, and he makes a statement that there are 10 kilograms there. Here, there's no smoke and no statements at all. So what happened then was at about, I believe, actually 1242, what the record says is that the agents naturally interviewed the driver.  But what the record of, excerpt from record pages 53 to 54 tell you is this wasn't just a truncated interview. I believe that's what my colleague used the phrase in his brief. Ms. Canales initially denied knowledge, gave a story, and then after she was pressed on that story, changed, basically changed her statement. And then she admitted knowledge, not only that, she inculpated the co-defendant. Now, this kind of a thing, the record doesn't say how long that interview took, but it says it started at 1242 p.m. But I think a couple points, again, one, the burden of proof isn't on this table, it's on this table. So to the extent there's any ambiguities in the record, it shouldn't be laid at our feet. But I think the second point is you can reasonably infer when somebody takes the time to give a false statement and then has to be pressed on it and change your story, that's going to take some time. And not only that, Ms. Canales, and this is an excerpt from Record 54, she did an interesting thing after implicating the defendant. She further stated that the two guys that had brought them down to Tijuana, Mexico, had been pulled into the vehicle's secondary lot at the same time she and our defendant were. And this co-defendant stated they were driving a black Honda and that they were the two guys in the security office when the special agent first walked in. Now, again, that's a very intriguing fact. I think any reasonable agent, when faced with that, is going to want to maybe investigate and look out in the secondary office further. Now, I'll grant you, that's not in the record that that happened, but again, the burden of proof was on the defense. So what do we have now? We have a car with 150 pounds of marijuana and 37 packages. That takes time to withdraw those packages. We have a co-defendant that the agents are rightly questioning in order to determine whether to charge this defendant. And we've got an interview that presumably goes past 1 p.m. Now, another thing. Next question. When were the drugs found? The drugs, I believe, the very first package may be around 930. There was a dog alert, and then somebody pulled back. The investigator saw one of the 37 packages. Well, when you saw one of the 37, wouldn't that have put you on notice that there was a probability of a claim being asserted against Taurus? I mean, wasn't that enough to start the process? Well, to start it, Your Honor, but I think it's still important as to when it ends. The agents, they want to know exactly how many drugs are found. That affects the statutory maximum that the defendant's looking at. That's always part of a complaint, an indictment. But they want to get all those drugs out and find out exactly what they're looking for. Does the law require it? Are you saying all the drugs had to come out before the criminal complaint process could begin? Is that what you're saying? Not necessarily, but what I'm saying is the question here is, was the delay reasonable? And at this point, remember, they don't have any evidence tying the defendant to those drugs at all. He was just a mere passenger. If we brought the case to trial on those facts alone, under the law of the circuit, it would be Rule 29, we couldn't convict him. All I'm saying is that to the extent the defense wants to make it sound like, oh, this poor 22-year-old guy. Let's take your expanded timeline. At what point are you saying you could not, you know, what's your red line, famous line these days? When are you saying they had enough to file a viable complaint? I believe after the interview of the defendant was concluded, which is sometime after 1 p.m., but we don't know when that is in the record. And now I think this is another point to keep in mind. The defense is always operating on this. It was sometime after 1 p.m., so you had plenty of evidence to at least charge the defendant at that time, right? Correct. All right. And from what I understand, the officers just need to fill out a complaint and they send it over to the magistrate. Correct. Now, the magistrate's only 17 miles away. It doesn't take long to get there. Why wasn't that done? Again, to the extent there are ambiguities in the record, we don't know exactly, Your Honor. But I think this is important to keep in mind. Yeah, it's 15 miles or 17 miles away, but the defense is always operating on a presumption that court started at 2 p.m. When you look at the only cite they've ever given for that, I mean, I litigated Liera. They put in judicially noticeable documents about the exact calendar. Here, their only cite is excerpt of record page 141, and there's a footnote. And it says sometimes court starts at 1.30, sometimes it starts at 2. If this court started, if magistrate court started at 1.30, and we have an interview that goes past 1 p.m. of the co-defendant, it now takes time. I think the defense has another assumption that somehow you just rush right to the courthouse and bring this person up. That's not what happens. As this court recognized in Van Poyck, there are a number of procedures. Most notably, one of them is required by statute under 18 U.S.C. 3154. That defendant needs to be processed by pretrial services. There's no reigning judge that I've ever known that when they have to determine bail, they want a record, you know, what are your financial resources, what's your criminal history. All I'm saying is the government, the question is, did they carry you? Was there a pretrial services officer close by? The magistrate judge? Close to the magistrate, yes, but it takes time to get them in there. And what I'm saying is if court. To get what in there? Well, to get the defendant in there. Well, it's only 17 miles. Correct, Your Honor, but, you know, you travel those 17 miles, and then it's not like 30 seconds later you're in front of the judge. You've got to bring him down. You've got to make a secure movement. He has to be tested. There was no effort to take him. I mean, if we were arguing about failure to get in front of the judge because of intervening circumstances such as, you know, you get there and whatever, there's nobody there, it takes time, and he gets rolled over, then that's not on your nickel. What we're looking at, particularly in light of Valenzuela-Espinosa, is the push to get the accused before the magistrate judge so that he can be advised of his rights and those matters that are required under McNabb and Mallory are addressed. And they're quite explicit about that. So the concern I have is this balancing between the competing interests, and as Valenzuela points out, that's where the six-hour window comes from. Congress made a balancing there, and I'm unclear. You're talking about their burden of proof, but your argument seems to say, well, this takes time. We couldn't have really initiated the incarceration, confrontation, all of that with the judicial branch being brought into it until we had completed our interview with Torres. Correct, Your Honor. Right, so where's the interview with Mr. Torres? That was at 1142 or 1152. Yeah, but he invokes his rights then. Correct. So is that the point at which you should have – you're saying you couldn't know at that point. No, because I'm saying – So where in the sequence was, in your view, it appropriate to move him over to the magistrate court? It couldn't have started any sooner than the co-defendant's interview was completed. Okay, and when was that? That was, again, all we know – No. No, it started 1242, and it must have taken some time. And that's where I say, you know, the defense had the burden to show that, wow, maybe it only took 15 minutes, and then they sat on their rear ends for three hours. The record doesn't say that. So to the extent there's that ambiguity, all I'm saying is when you look at the facts here, they were doing everything they could to decide whether to charge him or not. And I know, Your Honor, it also brought up the 3501C, the six-hour safe harbor. I think that's kind of a subset of McNabb-Mallory. This defendant invoked – another point I want to be clear about here – he invoked, and they left him alone. Corley says, you need to determine if it's unreasonable in light of the McNabb-Mallory cases. I couldn't find a single case that ever had facts like that. If somebody invokes and then doesn't decide until they change their mind on the way into the courthouse, I mean, that's clearly not the facts presented by Corley or Lierra. Lierra re-quotes Corley when it says, delay for the purpose of interrogation is the epitome of unnecessary delay. So there was a delay. And he spent, what, two nights holding cell with about 12 other people? Nine or 12 people. Down on the floor. Correct. Had a blanket. You know, it's kind of an inference there that you're giving them a taste of what's the effect of the delay. Of what's to come. And so after he spent two days there, then they decided to take him to a regular prison. And on the way this conversation takes course. And then he's told by the officer that, well, it goes a lot easier on you if you fess up, in a sense. And that's what happened. Your Honor's been kind enough, if I can have just a little extra time, because that's important. You brought up some important points, Judge Gregerson. Sure. If I leave you with anything here today, this whole thing about the substandard conditions I believe is a red herring in this case. And you know why? But he was in the cell with 12 other people. With nine to 12 other people, correct. Yeah. And when it came time for him to talk. That doesn't even take you up to Motel 6 in the old days. Correct. And yet when he comes out and he talks to the agent, he never, first of all, he never testified at the suppression hearing. So we don't know how much this all weighed on him. Second of all, when you look at the affidavit that he supplied, it says nothing. Other than the fact that I had to sleep, you know, it was cold in blankets. When you look at it, excerpt of record, page 58, he never says those conditions are what caused him to change his mind. And there was never any testimony to that effect. Instead, he says because of what the agent was saying, I felt I had to make a statement. And, in fact, on Saturday night, excerpt of record 114 to 115, he was working out in his cell, doing exercise. This doesn't sound like somebody who's being tortured. We're not talking about torture. Well, I mean, all this talk about substandard conditions, I just want the record to be clear. And the last thing, Your Honor. It's a standard condition to have 12 people sleep in one holding cell. It's not good. Cots or blankets or anything like that. It can definitely be improved, and that's a separate litigation. But what I'm saying is my opponent is a good advocate. When he comes up here and then tries to make you think that, wow, all this is what caused this young man to talk, there's zero evidence of that in the record. And, Your Honor, what you would hypothesize the agent saying, the district court didn't find that. It was in the defendant's declaration. They asked the agent, did you say that talking would make things go easier on you? No. He never said that. Well, the government knew that this long weekend was coming up. Right? Correct. Sure. Now, if you didn't have the facilities to hold somebody overnight, why don't you just call up the magistrate and say, we've got this person. We're through. It takes us a little longer to finish the search. We've got a statement from the driver of the car, and we may be a little late, but you wait for us. We'll bring him over. Why not do that? I don't know. And you know, it would have been great. You know, all you had to do was call. He was your prisoner. And, Your Honor, they have the burden of proving something. They didn't ask that question why that didn't happen. Well, you know, it's just a human, decent thing to do. You've got a young man over here, and he's 22 years old. He's never had a problem. We know he's sitting there. Right. So you call. It just doesn't look good. And that I agree. It doesn't look good. I agree. It can be improved. And you know, we've had this happen before, these long weekends. Now almost every weekend is a long weekend because nobody wants to work anymore. Dad, I don't know you. I'm not sure about that. Monday holidays. I was there last week. Look in the record where he says, at any point, wow. And then we're going to be laying people off. Thank you. I appreciate the court's time. Thank you. You have some time? He's got a minute, 32 seconds. Move. I'll try to do it wisely, Your Honor. It seems that the thesis of the government's argument is, oh, we needed to do more investigation. We needed to interview the other person. That's one thing you've heard from the government. Well, that makes sense. If he's not saying anything, then he's the passenger. Except the fact Mallory has squarely rejected that. And I'll give you the quote. Mallory says you can't do that. Once you have probable cause... Who was the... that was Mallory? Yeah, and the others. What was Mallory charged with? I believe it was a murder. Yeah, so if you've got enough on Mallory, but then his argument is he's a passenger, and their judgment they would not have had sufficient  He properly invoked his rights. He's the passenger. He's saying, well, okay, that's too bad. You've got to go with what you've got, even though you've got the driver, who seems a logical witness. So Mallory I don't think is a per se rule. Well, that's not the beginning and the end. I agree, but you sounded like you wanted to make it the end. Well, that's the end of that argument, as far as I'm concerned, but I think the idea is that we're not saying the government has to stop its investigation. Nobody's saying that. The government just has to bring you before a neutral magistrate, just bring the person before the third branch of the government. Yeah, we understand that, but there's the practicality is if you don't have the evidence to support it, then you don't have a viable complaint. But the idea that finding drugs in a car and that you don't have the evidence, the Rule 29 reference is not accurate on the law. Thank you, Your Honor. Thank you.
judges: Daniel, Pregerson, Fisher